CITY OF KANSAS CITY, Missouri
AVIATION DEPARTMENT,
Respondent,

v.

DIRECTOR OF REVENUE, Appellant.

No. SC 90714.

Supreme Court of Missouri,
En Banc.

June 29, 2010.

Jeremiah J. Morgan, Attorney General's
Office, Jefferson City, for Director of Revenue.

Mark W. Comley of Newman, Comley & Ruth PC, Jefferson City, Melody L. Cockrell, Kansas City, for City of Kansas City.

MICHAEL A. WOLFF, Judge.

Kansas City buys electricity from a local utility and sells it to tenants and subtenants at the city-owned Charles B. Wheeler Downtown Airport. After years of paying sales taxes to the state, the city in 2007 stopped paying the taxes because the city contended that it was not in the business of rendering a taxable service at retail under section 144.020, RSMo 2000.[1]

The director of revenue issued assessments against the city for the unpaid taxes. The city appealed the assessments to the administrative hearing commission, which upheld the city's position.

On this appeal, the Court holds that, in selling electricity to its tenants and subtenants, Kansas City is engaged in the business of rendering a service at retail that is subject to tax. The commission's decision is reversed, and judgment is entered for the director.

**Facts and Procedural History**

Kansas City owns and, through its aviation department, manages the Charles B. Wheeler Downtown Airport pursuant to its charter. It leases facilities at the airport to a variety of tenants, at least some of whom sublease some of their leased space.

Two substations serve the airport with electricity. One substation, located on Richards Road, is owned partially by Kansas City and the distribution line from that substation is fully owned by Kansas City. Kansas City Power & Light ("KCP&L") provides Kansas City with electricity at the substation and bills the city about six cents per kilowatt hour for the electricity as it enters the substation. The Richards Road substation provides all of the electricity for the tenants and subtenants located on the west side of the airport. Each building on the west side of the airport has a separate electrical meter, which Kansas City owns and maintains. City employees read the meters and record the readings at each location on a monthly basis. Kansas City then bills each tenant and subtenant about nine cents per kilowatt hour. The rate charged to the tenant or subtenant is designed to recover some of the city's expenses for providing electricity.

The facilities on the east side of the airport receive their electricity from a distribution line extending from the Broadway Bridge substation. Both the substation and this distribution line are owned by KCP&L. Facilities on the east side of the airport are billed in three different ways. The tenant and subtenants located in hangar Nos. 2 and 3 are metered through individual meters and billed by Kansas City in the same way as tenants on the west side of the airport. A second group of tenants, located in the terminal building, are not metered individually by the city because of logistical difficulties in providing individual meters within the building. Instead, the city estimates electricity usage and embeds the estimated cost of electricity in the tenants' rent. Finally, a third group of facilities, located north of the terminal building, receive their electricity directly from KCP&L, which is responsible for metering, billing and collecting sales tax. In this case, only the electricity usage by the tenants and subtenants who are metered and billed by the city is at issue.[2]

---

1. All statutory references are to RSMo 2000 unless otherwise indicated.

2. Specifically, the electricity of the tenants on the west side of the airport and the tenant and

Prior to August 2007, Kansas City reported the amounts collected from its metered tenants for their electrical usage as taxable. In August 2007, however, the city stopped paying sales tax returns for the electrical usage of its metered tenants. This led to the director of revenue assessing sales taxes to Kansas City for the months of August, September and October 2007, which were estimated based on the city's previous returns.[3]

Kansas City appealed the director's sales tax assessments to the administrative hearing commission. The commission found that Kansas City is not subject to sales tax on its provision of electricity to its lessees because the city is not engaged in the business of rendering a taxable service at retail under section 144.020. The commission's decision was based on a finding that Kansas City was not "in the business" of selling electricity. Rather, the commission stated that "[t]he city provides a public service with its airport" pursuant to the city's charter "and the provision of electricity is a necessary incident to that service." The commission further reasoned that the city was not "provid[ing] electricity to its tenants with a profit motive in mind."

Kansas City also argued that the tax was prohibited by article III, section 39(10) of the Missouri Constitution, which prohibits sales tax on a city's purchases. The commission found that it was the city's "sales" of electricity that were at issue, not the city's purchases, but said that, regardless, the city was not required to pay sales tax.

The director sought review of the commission's decision that the city's provision of electricity to its tenants was not subject to sales tax. The court of appeals found that the decision of this case required "construction" of the revenue laws, which is under this Court's exclusive jurisdiction pursuant to article V, section 3 of the Missouri Constitution, and transferred the case to this Court pursuant to article V, section 11 of the Missouri Constitution.

## Analysis

This Court reviews the commission's interpretation of revenue laws *de novo*. *Six Flags Theme Parks, Inc. v. Dir. of Revenue*, 102 S.W.3d 526, 527 (Mo. banc 2003). The commission's factual determinations are upheld if they are supported by the law and they are supported by substantial evidence in the record. *Id.*

Section 144.020.1 levies and imposes a tax "upon all sellers for the privilege of engaging in the business of selling tangible personal property or rendering taxable service at retail" in the state of Missouri. A "seller" is defined as a "person selling or furnishing tangible personal property or rendering services, on the receipts from which a tax is imposed pursuant to section 144.020."[4] Section 144.010.1(11). A "'[s]ale at retail' means any transfer made by any person engaged in business, [including] [s]ales of electricity [and] electrical current...." Section 144.010.1(10)(b). The issue before this Court, therefore, is whether Kansas City is

---

subtenants located in hangar Nos. 2 and 3 is at issue.

**3.** The sales tax assessed for the airport was $1,457.03 for August, $1,353 for September and $1,277.50 for October 2007, a total of $4,088.31. Under agreement with the director of revenue, the city has filed "zero"

returns for any reporting period subsequent to October 2007 pending the outcome of this case.

**4.** The statutory definition of a "person" includes a municipal corporation such as Kansas City. Section 144.010.1(6).

engaged in the business of selling electricity to its airport tenants.

■ Section 144.010.1(2) defines "business" as "any activity engaged in by any person, or caused to be engaged in by him, with the object of gain, benefit or advantage, either direct or indirect.…" This Court has previously noted that "[t] his language is very broad, and is surely designed to make transactions [that] might not otherwise be covered taxable." *St. Louis Country Club v. Admin. Hearing Comm'n of Missouri,* 657 S.W.2d 614, 617 (Mo. banc 1983). To demonstrate a person is engaged in business, the director is not required "to show that the taxpayer has a purpose of maximizing revenue, or of deriving income.…" *Id.*

In *St. Louis Country Club,* the Court found that private country clubs were engaged in the business of providing the clubs' facilities for members' guests for a fee. *Id.* The Court reasoned that club members undoubtedly considered "the opportunity to entertain guests to be important for social or business reasons." *Id.* at 617–18. Therefore, because club members received a benefit from guests being able to come to the clubs, the clubs also received a benefit since the clubs "exist only for the benefit of their members." *Id.* at 617. This benefit was sufficient for the Court to find "at least an indirect benefit or advantage from guest fees" such that the country club was engaged in business, even though the clubs were not-for profit corporations and their budgets regularly showed a deficit at the end of the year. *Id.* at 615, 618.

Relying on its decision in *St. Louis Country Club,* this Court has also held that the fees charged by a city to operate its recreational program, as mandated by the city's charter, are taxable. *City of Springfield v. Dir. of Revenue,* 659 S.W.2d 782, 783, 785 (Mo. banc 1983). The Court

noted that these fees, including admission fees, participation fees and sales of concessions, "seldom exceed[ed] and often [did] not meet the direct costs of the program," and that the city often had to subsidize most of the programs through property taxes. *Id.* at 783. The Court also noted that the funds to pay for the activities and the sales taxes to be imposed "are appropriated and come from public funds of the [c]ity." *Id.* Nevertheless, the Court found that the city of Springfield was engaged in a business, and the fees were taxable. *Id.* at 785.

In both *St. Louis Country Club* and *City of Springfield* the fees received were not sufficient to cover the expenses of either the country clubs or the recreational activities of the city. Similarly here, the nine cents per kilowatt hour apparently is not enough to cover Kansas City's expenses in providing electricity to its tenants. However, as suggested by this Court in *St. Louis Country Club* and *City of Springfield,* nothing in the definition of "business" suggests that an entity engaging in business must recover a profit or even break even.

To be engaged in a business, the city only needs to receive an indirect gain, benefit or advantage. Section 144.010.1(2). In this case, the commission's decision specifically noted that "[t]he City provides a public service with its airport, and the provision of electricity is a necessary incident to that service. *The use of the electricity is for the purpose of furthering the City's governmental interest* in leasing the airport facilities." (Emphasis added). Further, Kansas City admits that it had other options it could have pursued in ensuring its tenants received electricity, but it would have been economically imprudent for the city to do so. Like in *St. Louis Country Club* where this Court found that club members' interest in being

able to entertain guests at the club was an indirect benefit to the club so that guest fees were taxable, here Kansas City's interest in leasing its airport facilities is furthered by providing electricity to its tenants and subtenants, and the city is receiving an indirect benefit.

It is immaterial that Kansas City's provision of electricity is simply something the city does as part of its charter-mandated ownership and management of an airport. In *City of Springfield,* Springfield was required to provide recreational services pursuant to its charter. Providing concessions and charging admission fees and performance fees were a necessary incident to the city's provision of recreational services that the city chose to provide. Nevertheless, this Court held those fees to be taxable. *City of Springfield,* 659 S.W.2d at 785. Here, Kansas City chooses to buy electricity from KCP&L for six cents per hour and then provide the same electricity to its tenants and subtenants for nine cents per kilowatt hour.[5] Like Springfield, Kansas City is engaging in business under section 144.010.1(2).

■ Kansas City also argues that the director's tax on electricity is prohibited by article III, section 39(10) of the Missouri Constitution. Article III, section 39(10) provides that "[t]he general assembly shall not have power … [t]o impose a use or sales tax upon the use, purchase or acquisition of property paid for out of the funds of any county or other political subdivision." The commission properly found that the director is making no attempt to tax the city's purchases of electricity here. Instead, the director is taxing the city's "sales" of electricity to its tenants, who are the ones using, purchasing and acquiring the electricity. *See City of Springfield,* 659 S.W.2d at 784 ("It is clear that there is no constitutional prohibition to the sales tax here imposed. The sales tax is nothing more than a tax on gross receipts from the selling of goods or providing services at retail. It is evident that there is no tax on the use, purchase or acquisition of property paid for from City funds.").

### Conclusion

Kansas City is engaging in the business of selling electricity to its tenants and subtenants. The city, therefore, is required to pay sales tax on these sales under section 144.020. The decision of the administrative hearing commission is reversed, and judgment is entered in favor of the director. Rule 84.14.

All concur.

---

**5.** The city argues that, unlike the voluntary purchasers of the goods and services in *City of Springfield,* here each tenant's need for power is joined inextricably to the use and enjoyment of the tenant's leasehold. However, as stated above, the plain language of the statutory definition of "business" makes clear that the test is whether the taxpayer receives a gain, benefit or advantage by providing the good or service. No analysis is required of whether the good or service is needed for full use of another good or service. Further, just as the purchasers of participation fees in *City of Springfield* had to pay these fees to participate in the relevant activity, the tenants here have to pay for electricity to enjoy their leaseholds fully.